IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

STEPHANIE LYN EDWARDS                                      PLAINTIFF


v.              Civil No. 3:14-cv-3112-MEF


CAROLYN W. COLVIN, Commissioner
Social Security Administration                             DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, Stephanie Edwards, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying her claim for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).   In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  *See* 42 U.S.C. § 405(g).

I.      **Procedural Background:**

Plaintiff filed her applications for DIB and SSI on July 5, 2011, alleging a disability onset date of December 22, 2009, due to anxiety, depression, seizures, fibromyalgia, osteoarthritis, and chronic pain.  Tr. 197, 230, 281, 301.  The Commissioner denied her applications initially and on reconsideration.  Tr. 88-91.  An Administrative Law Judge ("ALJ") held an administrative hearing on May 2, 2013.  Tr. 39-87.  Plaintiff was present and

represented by counsel.  On May 8, 2013, the Plaintiff voluntarily amended her onset date to May 25, 2010.  Tr. 13.

At the time of the hearing, she was 30 years old with a general equivalency diploma and an Associate's Degree in Business.  Tr. 28, 49, 194.  She had past relevant work ("PRW") experience as an office manager, server, fast food worker, and film operator.  Tr. 28, 78-79, 231, 252-259.

On July 23, 2013, the ALJ found the Plaintiff's asthma, chronic obstructive pulmonary disease ("COPD"), history of pseudoseizures, fibromyalgia, history of irritable bowel syndrome ("IBS"), history of hyperextended joint disease, migraine headaches, history of cervical cancer, radiation cystitis, history of histoplasmosis/Lyme disease, depression, and bipolar disorder to be severe, but concluded they did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.  Tr. 16-18.  After partially discrediting Plaintiff's subjective complaints, the ALJ determined the Plaintiff retained the residual functional capacity ("RFC") to perform sedentary work

> with the option to alternate between sitting and standing every 30 minutes.  She should avoid climbing ladders/ropes/scaffolds and exposure to hazards and vibrations.  She can occasionally climb ramps/stairs, stoop, kneel, crouch and crawl.  She should avoid concentrated exposure to dust, odors, gases, and fumes.  She is limited to simple instructions, simple routine tasks, with occasional contact with supervisors, co-workers and the general public.

Tr. 19.  With the assistance of a vocational expert, the ALJ found the Plaintiff capable of performing work as a small parts mounter and bonder.  Tr. 29.

The Appeals Council denied the Plaintiff's request for review on September 30, 2014.  Tr. 1-7.  Subsequently, Plaintiff filed this action.  ECF No. 1.  This case is before the undersigned by consent of the parties.  Both parties have filed appeal briefs, and the case is now ready for decision.  ECF Nos. 9, 10.

2

## II.   **Applicable Law:**

This court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin,* 761 F.3d 853, 858 (8th Cir. 2014). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382(3)(c). A Plaintiff must show that his or her disability, not simply their impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits:  (1) whether the claimant has engaged in substantial gainful activity since filing his or her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his or her age, education, and experience. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Only if he reaches the final stage does the fact finder consider the Plaintiff's age, education, and work experience in light of his or her residual functional capacity.  *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

## III.   Discussion:

On appeal, the Plaintiff raises two issues:  1) whether substantial evidence supports the ALJ's RFC determination, and 2) whether the ALJ assigned the proper weight to the Plaintiff's treating physician.  The Court has reviewed the entire transcript.  The complete set of facts and arguments are presented in the parties' briefs and the ALJ's opinion, and are repeated here only to the extent necessary.

### A.   RFC Determination:

In her first argument, the Plaintiff contends that the ALJ's RFC determination is flawed because it does not account for all of her work-related limitations.  RFC is the most a person can do despite that person's limitations.  20 C.F.R. §§  404.1545, 416.945.  A disability claimant has the burden of establishing his or her RFC.  *Vossen v. Astrue,* 612 F. 3d 1011, 1016 (8th Cir. 2010).  "The ALJ determines a claimant's RFC based on all relevant evidence in the

record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010); *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Miller v. Colvin*, 784 F.3d 472, 479 (8th Cir. 2015) (citing *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012).

The transcript in this case is over 2,000 pages in length and comprised of over 1,700 pages of medical evidence. Evidence predating the Plaintiff's date of onset reveals treatment for a variety of ailments, including vomiting and diarrhea, abdominal pain, fibromyalgia, anxiety, depression, migraine headaches, and possible seizure activity. Tr. 343, 346, 368, 409. In 2004, doctors also diagnosed her with bipolar disorder with psychotic features and personality disorder. Tr. 456, 563, 577. Doctors prescribed Effexor, Trazodone, and Tramadol to treat her impairments.

In April 2010, Dr. Randall Hightower diagnosed the Plaintiff with adenosquamous carcinoma of the cervix. Tr. 779-781, 861-863, 1200, 1238-1240, 1976. After discussion of her treatment options, the Plaintiff elected to undergo a radical hysterectomy. CT scans of her abdomen and chest completed in preparation for surgery revealed no evidence of metastatic disease within the abdomen or pelvis, but showed a subpleural non-calcified node within the medial right lower lobe of her lung. Tr. 803-804, 887-889, 924-926, 1210, 1252-1253, 1326-

1327, 1585-1587, 1961.  A biopsy proved the nodule benign, consisting of epithelial cells, narcotic debris, and rare giant cells.  Tr. 796, 798, 800, 1243-1249.  However, the biopsy caused a pneumothorax and necessitated an overnight hospitalization and the temporary placement of a chest tube.  Tr. 795, 798, 1121-1132, 1242, 1245-1247, 1313-1314.

In June 2010, the Plaintiff began treatment with Dr. John Kendrick for anxiety, depression, and pelvic pain.  Tr. 773-778, 916-921, 1588-1593, 1961.  He prescribed Effexor, Trazadone, and Tramadol.  He later changed the Tramadol to Hydrocodone and had the Plaintiff sign a pain medication contract, agreeing to take the medication only as prescribed. Tr. 887-889, 924-926, 1585-1587.

In mid-July 2010, the Plaintiff was treated in the emergency room for mental status changes and weakness.  Tr. 1105-1115, 1207, 1301-1312.  She complained of nausea and weakness over the preceding three days.  On the day of her visit, the Plaintiff had presented for lab work.  Upon presentation, she became sweaty, went into the restroom and vomited, and "then went down to the floor."  The Plaintiff denied any loss of consciousness, rather referring to this episode as a seizure.  She reported experiencing seizures, headaches, and nausea since grade school.  A neurologist had prescribed Topamax for these episodes, but she had been unable to afford it.  The Plaintiff was now receiving Medicaid benefits and was financially able to obtain her prescriptions.  The doctor prescribed Topamax for migraines and seizures and Metoprolol for what he termed neurovasogenic syncope.  He also noted that she tested positive for opiates, propoxyphene, and cannabis.

On August 16, 2010, the Plaintiff underwent a hysterectomy.  Tr. 871-877, 1059-1101, 1283-1296, 1329-1332.  She was released home three days later with instructions to consult with oncologists, Drs. Arnold Smith and Eric Schaefer regarding radiation and concurrent

chemotherapy.   Between September and November 2010, the Plaintiff received radiation treatments five days per week for six weeks concurrent with weekly chemotherapy for five weeks.   Tr. 868-870, 933-935, 983-993, 996, 999-1030, 1342-1348, 1363-1362, 1366-1387, 1389-1400, 1415-1424, 1443-1444, 1574-1576.   Treatment caused a great deal of nausea, vomiting, and abdominal pain.   She required IV fluids at least three times per week and had problems with her veins blowing causing possible extravasation of her chemotherapy. Accordingly, in early October, Dr. Jeffrey Bell placed a port into her left internal jugular vein. Tr. 835-836, 839, 1053-1058, 1276-1282.   The port was removed in January 2011, following completion of her cancer treatment.   Tr. 837-838.

On December 1, 2010, neurologist Dr. Jhablall Balmakund evaluated the Plaintiff for reported seizure activity.   Tr. 809-812.   Her last reported seizure was October 10.   The Plaintiff indicated that her symptoms included a metallic taste, blurred vision, occasional "zig zag" at the periphery, nausea, vomiting, feeling as though she were not quite "there," headaches, frontal lobe stabbing/pounding, and photo and phonophobia.   She stated that her seizures could last from a few hours to a day, with extreme fatigue following each spell.   Dr. Balmakund noted normal physical, mental and neurological exams.   He diagnosed chronic pain syndrome versus primary generalized seizures and migraine headaches.   Aside from the metallic taste, Dr. Balmakund found it difficult to discern whether she was experiencing true seizures or just significant migraines.   However, he thought it odd that her "seizures" were reportedly controlled by such a small dosage of Topamax.   Accordingly, he advised her to continue the Topamax and asked for copies of her previous MRI and EEG results.

On December 22, 2010, infectious disease specialist, Dr. Stephen Hennigan, evaluated the nodule in the Plaintiff's lung.   Tr. 815-816, 819-80.   He determined it to be histoplasmosis,

with repeated CT scans showing complete stability.  On examination, her lungs were clear and there was no evidence of wheezing, rubbing, or crackles.  Dr. Hennigan concluded she required no further evaluation or work-up.  Repeat CT scans conducted throughout the relevant time period consistently revealed a stable nodule with no additional nodule formation.

Between December 2010, and September 2013, the Plaintiff sought treatment for chronic pain syndrome, fibromyalgia, and migraine headaches from her treating physician, Dr. Kendrick.  He prescribed Hydrocodone, Topamax, and Flexeril.  Tr. 786-782, 805-807, 840-854, 936-975, 1035, 1511-1573, 1685-1725, 1780-1782, 1866-1903, 1910-1929, 1944-1948, 2013-2027.  The Plaintiff reported lower back, right hip, bilateral knee, and leg pain; fibromyalgia; depression; and, recurrent urinary tract infections.  She rated her pain anywhere from a 5 on a 10-point scale to a 10, but routinely voiced satisfaction with her treatment regimen and indicated she was able to perform her activities of daily living with minimal interruption.  Although physical exams occasionally revealed pain in her right hip joint and lumbar spine, suprapubic tenderness, tenderness in her coccyx, or trochanteric tenderness, Dr. Kendrick typically noted no abnormalities.  Moreover, the Plaintiff persistently denied experiencing neurological symptoms such as seizures.

In March 2011, the Plaintiff began seeing Dr. Hightower every three months for follow-up PAP smears to monitor her for cancer recurrence.  Tr. 1035-1036, 1189, 1191-1192, 1195-1196, 1432-1433, 1617-1629, 1631, 1949-1957, 1959-1960, 1979.  Through January 2012, these PAP smears consistently revealed atypical squamous cells of undetermined significance.  However, no additional treatment was required.

On April 11, 2011, the Plaintiff consulted with rheumatologist, Dr. Tamer Alsebai regarding her arthritis.  Tr. 1144-1149, 1154-1159.  Records reveal he had treated her prior to

8

the relevant time period, diagnosing her with fibromyalgia in 2005. The Plaintiff reported pain in her right hip and back, which she rated as a 6 on a 10-point scale; some morning and evening stiffness; and, dyspareunia. Her pain was aggravated by activity, movement, and weight bearing and relieved by medication and the application of heat to the affected area. Fatigue, sleep disturbance, and swelling in the affected joints were also a problem. Dr. Alsebai noted 15 out of the 18 possible fibromyalgia tender points with tenderness in the trochanteric bursa. He diagnosed her with fibromyalgia, hypermobility joint syndrome, and trochanteric bursitis. Dr. Alsebai advised her to restart Flexeril and Gabapentin, gave her samples of Lidoderm patches to wear on an as needed basis, and indicated that he would consider steroid injections into the trochanteric bursa. He also recommended that she consult her radiation oncologist for treatment of her dyspareunia, and stressed the importance of stress management and exercise in the treatment of fibromyalgia.

On April 19, 2011, the Plaintiff returned to Dr. Schaefer for a follow-up exam. Tr. 1040-1044, 1450-1454. She complained of recurrent UTIs; fibromyalgia; abnormal PAP smears status post surgery, radiation, and chemotherapy for cervical cancer; dizziness; and, headaches. The Plaintiff also reported some depression associated with marital conflict and a very controlling spouse. Dr. Schaefer referred her to HOPE for medication assistance and counseling.

In early May 2011, the Plaintiff began reporting some urinary incontinence in addition to her recurrent UTIs. Tr. 957-960, 1548-1551, 1722-1725. A physical exam revealed suprapubic tenderness, resulting in diagnoses of chronic pain syndrome, cervical cancer status post treatment, fibromyalgia, migraine headaches, and frequent UTIs. Dr. Kendrick advised

her to consult with Dr. Hightower, who in turn referred her to urologist, Dr. Jeffrey Sekula, for the treatment of possible radiation induced cystitis.  Tr. 1194, 1958.

On May 26, 2011, Dr. Sekula evaluated the Plaintiff, noting her history.  Tr. 892-895, 1172-1175.  She complained of dysuria and urinary frequency.  Records indicate that the Plaintiff had initially developed lower urinary tract symptoms following radiation to her pelvis and said symptoms persisted despite antibiotic therapy.  Dr. Sekula diagnosed frequent UTIs, female pelvic pain, and psychophysiological dysuria.  He prescribed Oxycodone-Acetaminophen and Topamax for health maintenance and Lorazepam for her UTIs.  Dr. Sekula also ordered a cystourethroscopy and cytology exam for further investigation.

On June 6, 2011, the cystourethroscopy showed minimal prominence of the submucosal vasculature at the bottom half of the bladder, but no true evidence of cystitis.  Tr. 896-897, 1176-1177.  A urine analysis was also negative for infection.  Accordingly, Dr. Sekula performed a bladder washing and prescribed rescue treatment once per week for six weeks as well as Pyridium to treat her discomfort.

On August 10, 2011, Dr. Schaefer increased her Lexapro dosage, noting continued marital conflict and the impending death of a family member suffering from cancer.  Tr. 1045-1049.  The Plaintiff rated her pain as an 8 on a 10-point scale and her fatigue as a 7.  She complained of chronic fatigue and insomnia.

On August 23, 2011, Plaintiff reported that the medications prescribed to treat her fibromyalgia were primarily helpful at night.  Tr. 1143, 1153.  However, the pain in her back, hips, knees, shoulders, and fingers persisted during the daytime hours.  Dr. Alsebai diagnosed her with severe fibromyalgia, noting tenderness in all 18 of the fibromyalgia tender points; mechanical lower back pain; cervical cancer; and, hypermobility syndrome with a history of

seizures and osteoarthritis.  Dr. Alsebai gave the Plaintiff samples of Lexapro and Celebrex and advised her to continue the Gabapentin, Flexeril, and Lidoderm patch.  He also ordered lab tests and x-rays of her lumbar spine.

On September 29, 2011, Dr. Karmen Hopkins, a non-examining consultant completed a physical RFC assessment.  Tr. 1820-1827.  After reviewing her medical records, Dr. Hopkins concluded she could perform a full range of light work.

In November 2011, Dr. Schaefer again increased her Lexapro dosage due to her domestic issues.  Tr. 1474-1478.  She was separated from her husband and had obtained a protective order against him due to a history of domestic violence.

On November 9, 2011, Plaintiff underwent a mental status examination with Dr. Mary Sonntag.  Tr. 1480-1484.  Her chief mental complaints were problems with memory, concentration, and focus and mood swings.  The Plaintiff reported general malaise as well as panic attacks.  She denied a history of ongoing mental health treatment, absent a hospitalization in 2004 and medications prescribed by her treating doctor, due to a lack of funds and her fear that the records would be used against her in child custody proceedings.  Dr. Sonntag diagnosed the Plaintiff with depressive disorder and panic disorder without agoraphobia.  However, she noted the Plaintiff maintained the ability to communicate in an adequate and intelligible manner, cope with the typical mental and cognitive demands of the tasks assigned, maintain attention and concentration throughout the exam, and complete the tasks within an acceptable time frame.

On December 2, 2011, Dr. Christal Janssen, a non-examining psychologist, completed a mental RFC assessment.  Tr. 1816-1819.  She reviewed the Plaintiff's medical records and concluded she would have the following moderate limitations:   carrying out detailed

11

instructions, maintaining attention and concentration for extended periods, sustaining an ordinary routine without special supervision, completing a normal workday and workweek without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, accepting instructions and responding appropriately to criticism from supervisors, responding appropriately to changes in work setting, setting realistic goals; and, making plans independently of others.

On January 18, 2012, the Plaintiff was evaluated by neurologist, Dr. Roger Oghlakian for management of her alleged seizure disorder.  Tr. 1639-1657.  She reported experiencing seizures since the age of eight, the first of which occurred at school.  The Plaintiff alleged weekly seizures, stating she had never been seizure-free.  She acknowledged having tried Dilantin, Keppra, Depakote, and Trileptal to no avail.  In 2002, she was prescribed Topamax.  Following a normal exam, Dr. Oghlakian concluded that her seizures were mostly dialeptic, wherein she would stare blankly.  Both an MRI of her brain and an EEG were essentially normal, revealing no epileptiform activity or abnormal areas of enhancing mass, signs of blood, or iron deposits.  Tr. 1739-1740.  Accordingly, Dr. Oghlakian suspected her episodes were non-epileptic in nature and related to her significant history of personal psychiatric hospitalization for severe depression, anxiety, and physical abuse.

On follow-up exam with Dr. Oghlakian on February 22, 2012, the Plaintiff complained of headaches for the previous two weeks and increased seizure activity.  Tr. 1658-1671.  It was discovered that her headaches and seizures were linked to sexual activity.  Because her sexual activity had increased, she also reported an increase in her headaches and seizures.  The Plaintiff reported taking three Hydrocodone daily for headaches, fibromyalgia, and back pain.  Suspecting overuse headaches, Dr. Oghlakian discontinued her prescription for Neurontin and

substituted it with Lyrica.  He hoped this would decrease her need for Hydrocodone and improve what he called daily rebound headaches.  Dr. Oghlakian also ordered an overnight continuous video-EEG.  Further, he emphasized that the Plaintiff should not drive until she had been seizure free for at least six months.

On March 12, 2012, the Plaintiff was admitted for characterization of her seizure-like episodes triggered by sexual activity. Tr. 1741-1745. She reported experiencing one nighttime seizure a few days prior and admitted to taking the wrong dose of Topamax.  The Plaintiff also indicated that she had not started the Lyrica, instead continuing to take the Neurontin.  At this time, she also reported a history of sexual abuse at the age of 7 or 8, and physical abuse by her ex-husband.  The Plaintiff was diagnosed with non-epileptic spells, most likely psychogenic in nature due to her history of sexual and physical abuse and her significant psychiatric history. She was discharged with a prescription for Topamax, mainly as a migraine prophylaxis, and Lyrica to treat her fibromyalgia.  Follow-up with a psychiatrist and Dr. Oghlakian was strongly recommended.

On March 20, 2012, Dr. Edualdo Ulloa completed an RFC assessment.  Tr. 1828-1833. After reviewing the Plaintiff's medical records, he was of the opinion she could perform sedentary work requiring only occasional climbing of ladders/ropes/scaffolds, stooping, kneeling, crouching, and crawling and no concentrated exposure to hazards such as machinery or heights.

On April 23, 2012, the Plaintiff returned to Dr. Oghlakian's office reporting that Medicaid would not cover Lyrica.  Tr. 1764-1774.  Therefore, she had switched back to Neurontin.  She continued to experience spells, mostly nocturnal and in her sleep.  The Plaintiff also reported shaking, slurred speech, and urinary or bowel incontinence during these spells.

13

However, her headaches had improved.  Dr. Oghlakian again noted that her spells were likely caused by a post-traumatic disorder resulting from her childhood sexual abuse and other emotionally traumatizing experiences.  He strongly suggested that she see a psychiatrist, noting there was not much he could do for her.

In May 2012, Dr. Mark Edelstein treated the Plaintiff.  Tr. 1788, 1795-1797.  Dr. Edelstein noted that her PAP smear was negative, but a test for human papillomavirus ("HPV") was positive.  Further, an IV pyelogram with tomography revealed no obvious fistulous communication between the kidneys, bladder, and ureters.  Tr. 1790.

On June 14, 2012, Plaintiff returned to Dr. Schaefer in follow-up.  Tr. 1811-1815, 1904-1909.  She continued to report pain in her back and fatigue, rating her pain as a 6 and her fatigue as a 9.  Depression, stress, and insomnia also continued to be problematic for her.  She advised Dr. Schaefer that her last PAP smear had been negative, but she tested positive for HPV.  Dr. Schaefer noted the Plaintiff could not perform strenuous activity, but was ambulatory and able to carry out light or sedentary work (e.g., office work, light housework).  After documenting a normal physical exam, stabilization of her lung nodule as evidenced by CT scans revealing no change, and a negative brain MRI and EEG, he diagnosed her with non-epileptic seizure disorder, likely supratentorial in nature.

In October 2012, the Plaintiff presented in the emergency room with complaints of painful urination and blood in her urine.  Tr. 1840-1850.  She reported a long history of cystitis and indicated that she was experiencing perineal pain, which she rated as a 9.  The doctor diagnosed her with dysuria and referred her to a gynecologist for further assessment of her UTI/cystitis.

In December 2012, the Plaintiff was treated in the emergency room for abdominal pain, nausea, diarrhea, and some right sided chest pain worse with inspiration. Tr. 1852. An EKG, abdominal x-rays, and blood tests were normal. The Plaintiff was diagnosed with acute gastroenteritis and pleurisy. She was discharged with a prescription for Zofran.

On January 10, 2013, Dr. Kendrick wrote a letter indicating that the Plaintiff's biggest problem was the development of adenosquamous carcinoma of the cervix that had become metastatic and for which she had undergone radical treatment. Tr. 1875. He stated that she "gets by month to month requiring large amounts of narcotics." Further, Dr. Kendrick indicated that he did consider her disabled.

On April 11, 2013, the Plaintiff returned to the ER with complaints of abdominal pain, diarrhea, vomiting, and fever. Tr. 1983-1999. An examination revealed abdominal tenderness, but was otherwise normal. An abdominal CT scan showed a small calcification in the right lower lobe and a lesion in the liver. Some bladder wall thickening and linear areas of increased density, as well as increased attenuation in the presacral space were also noted, likely representative of post radiation changes. The doctor diagnosed her with cervicitis and prescribed Doxycycline Hyclate, Valium, Zofran, and Promethazine Hydrochloride.

On April 11, 2013, Dr. Kendrick composed a second letter. Tr. 1931. He indicated that she had not undergone a curative procedure for the carcinoma of the cervix. Dr. Kendrick also stated that she was being treated for arthritis and fibromyalgia, as well as multiple other medical issues. Again, in his opinion, she was disabled.

On May 3, 2013, Dr. Kendrick completed a physical RFC assessment. Tr. 1932-1935. He had been treating the Plaintiff since June 2010 for metastatic adenosquamous cell carcinoma, fibromyalgia, osteoarthritis, migraines, seizures, depression, and anxiety. He

15

assessed her prognosis as fair, and listed her symptoms to include chronic pain, depression, anxiety, muscle spasms, insomnia, headaches, weakness, and fatigue. Dr. Kendrick concluded she could sit for 30 minutes at a time for a total of 2 hours per 8-hour workday, stand for 15 minutes for less than 2 hours per 8-hour day, would need a job where she could alternate between siting and standing at will with periods of walking every 45 minutes for 1 minute, and would need 3-4 unscheduled breaks per day for 5 to 10 minutes. Further, he opined that she could perform sedentary work with occasional twisting and stooping, was incapable of even a low stress job due to her panic attacks and depression, would miss more than 4 days of work per month, and must avoid exposure to extreme temperatures and dust.

On May 6, 2013, a CT scan of her pelvis and abdomen revealed deep pelvic fat stranding and concentric thickening of the rectum suggesting radiation proctitis (inflammation of the lining of the rectum) and a decompressed urinary bladder. Tr. 2001-2003, 2009-2010. Radiation cystitis could not be excluded.

On May 9, 2013, a colonoscopy with bowel biopsy revealed only radiation changes and inflammation, but no histopathologic abnormality. Tr. 2008, 2031. Further, a barium enema was unremarkable showing no evidence of high-grade stricture, mucosal irregularity, or fistula.

In June 2013, Dr. Kendrick diagnosed the Plaintiff with swollen external hemorrhoids causing rectal bleeding and prescribed Proctofoam HC Cream and Sitz baths. Tr. 2017-2027. Then, in September 2013, he referred her for a gastrointestinal exam due to continued rectal bleeding. Tr. 2013-2015.

The ALJ concluded that the Plaintiff could perform sedentary work with the option to alternate between sitting and standing every 30 minutes and requiring no climbing of ladders/ropes/scaffolds or exposure to hazards and vibrations; occasional climbing of

16

ramps/stairs, stooping, kneeling, crouching, and crawling; no concentrated exposure to dust, odors, gases, or fumes; and, simple instructions, simple routine tasks, and occasional contact with supervisors, co-workers, and the general public.   The Plaintiff contends that her impairments necessitate a sit/stand at will option and would require her to miss two to four days of work per month.  After reviewing the record, we find that her condition does necessitate a sit/stand option, as found by the ALJ.  However, we do not find evidence to support a finding that she would miss two to four days of work per month.  Contrary to the Plaintiff's argument, the record shows no metastasis of her cervical cancer.  Although she has had abnormal PAP smear results since undergoing cancer treatment, repeat CT scans have shown no abdominal or pelvic metastasis.  Dr. Schaefer even found her capable of performing light or sedentary work, providing substantial support for the ALJ's decision.

A biopsy of the nodule in her lung indicated that it was benign and consistent with histoplasmosis.   Although the biopsy resulted in a pneumothorax and necessitated the temporary placement of a chest tube to allow the lung to reinflate, repeat CT scans proved the nodule stable with no development of additional nodules.  Further, infectious disease specialist, Dr. Hennigan, concluded she was doing well and required no additional treatment or work-up for this impairment.  While records also reveal that she suffered from COPD and asthma, these impairments did not require extensive treatment during the relevant time period.  As such, the record supports the ALJ's determination that she should avoid concentrated exposure to dust, odors, gases, and fumes.

The Plaintiff was also diagnosed with and treated for chronic pain syndrome, fibromyalgia, right hip and leg pain, osteoarthritis, migraine headaches, and psychogenic seizures.  Aside from the two treatment notes of Dr. Alsebai documenting fibromyalgia trigger

17

points, the Plaintiff's follow-up visits yielded minimal physical findings. *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider). She consistently reported satisfaction with her conservative treatment regimen, acknowledged an average pain level of 5 to 6 on a 10-point scale, and repeatedly admitted the ability to perform her activities of daily living. *See Smith v. Shalala*, 987 F.2d 1371, 1374 (8th Cir. 1993) (holding that treating physician's conservative treatment was inconsistent with plaintiff's allegations of disabling pain).

As for her alleged migraine headaches and seizures, we note that these "spells" were found to be nonepileptic and psychogenic in nature. And, she required minimal treatment for these alleged spells during the relevant time period. She also admitted that sexual activity triggered her spells, with them most frequently occurring while she slept. As such, aside from the seizure precautions included by the ALJ in the RFC assessment (hazard and height restrictions), the record does not support the imposition of any additional work-related limitations.

There is also some evidence to suggest that the Plaintiff's radiation treatment for cervical cancer resulted in abdominal pain, recurrent UTI's, cystitis, and proctitis. Although she did report some nocturnal urinary incontinence as well as urinary frequency and urgency, the record does not indicate that any of these impairments were severe enough to impose additional limitations on her ability to perform work-related activities.

Further, we find the Plaintiff's depression and anxiety to be fully accounted for in the ALJ's RFC determination. Although she does appear to have had some inpatient treatment for her mental impairments prior to the relevant time period, her treatment for these impairments during the relevant time period consisted of only prescription medication. Interestingly, Dr.

Kendrick consistently noted essentially normal psychiatric examinations.  In addition, Dr. Sonntag diagnosed the Plaintiff with mild to moderate major depression and anxiety without agoraphobia.  She also found her capable of communicating and interacting in a socially adequate and effective manner and completing tasks within an acceptable timeframe.  Further, the Plaintiff had no difficulty coping with the typical mental and cognitive demands of the tasks given to her during the evaluation and no difficulty with attention, concentration, or persistence.  Non-examining consultants Drs. Janssen and Bowles assessed her with some moderate mental limitations, but found her capable of performing unskilled work involving simple instructions and interpersonal contact that is incidental to the work performed. Accordingly, the undersigned finds that the ALJ's RFC determination is supported by substantial evidence.

### B.   Weight Afforded Treating Sources:

The Plaintiff also takes issue with the ALJ's treatment of Dr. Kendrick's RFC assessment.  Under the social security regulations, the commissioner will generally give a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s)" "controlling weight" when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 416.927(d)(2)3; *see also Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005).  However, such weight is neither inherent nor automatic and does not "obviate the need to evaluate the record as whole."  *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006); *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).  The commissioner "'may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating

physician renders inconsistent opinions that undermine the credibility of such opinions.'" *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (quoting *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010)); *accord Hacker*, 459 F.3d at 937 (noting we have declined "to give controlling weight to the treating physician's opinion because the treating physician's notes were inconsistent with her . . . assessment").

The Plaintiff contends that Dr. Kendrick's RFC assessment was entitled to controlling weight because it is supported by substantial medical evidence. We disagree. Although Dr. Kendrick has been her treating doctor since June 2010, his records do not document impairments and limitations that are consistent with his assessment. He repeatedly diagnosed her with fibromyalgia, osteoarthritis, chronic right hip and leg pain, anxiety, and depression, but rarely noted any remarkable abnormalities on physical or mental exam. The Plaintiff's own reports concerning her pain also fail to support Dr. Kendrick's assessment. The majority of her pain ratings were 5 to 6 on a 10-point scale and she reported satisfaction with her treatment regimen and the ability to perform her activities of daily living. It is also significant to note that the Plaintiff required no significant medication changes or adjustments.

Additionally, treating oncologist Dr. Schaefer and non-examining consultant Dr. Ulloa found the Plaintiff capable of at least sedentary work. Dr. Ulloa also concluded she could stand and walk for at least 2 hours per 8-hour workday; sit at least 6 hours per day; occasionally climb ladders/ropes/scaffolds, stoop, kneel, crouch, and crawl; and, must avoid concentrated exposure to hazards such as machinery and heights. Accordingly, after reviewing the entire record in this case, the undersigned concludes that Dr. Kendrick's RFC assessment was not entitled to controlling weight because it lacks the support of substantial evidence.

**V.**      <u>**Conclusion**</u>**:**

Having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the Plaintiff benefits, and affirms the decision. The undersigned further directs that the Plaintiff's Complaint be dismissed with prejudice.

DATED this 13th day of November, 2015.

<u>/s/ Mark E. Ford</u>
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE